UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:21-cv-371

| | | |
|---|---|---|
| SONYA CALLOWAY-DURHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| N.C. DEPARTMENT OF JUSTICE, | ) | **AMENDED** |
| JOSHUA H. STEIN, in his individual | ) | **COMPLAINT** |
| and official capacity as Attorney | ) | **(Jury Trial Demanded)** |
| General, LESLIE COOLEY- | ) | |
| DISMUKES, in her individual and | ) | |
| official capacity as Criminal Bureau | ) | |
| Chief, SHANNON CASSELL, in her | ) | |
| individual and official capacity as former | ) | |
| Civil Bureau Chief, and ALANA | ) | |
| DANIELLE MARQUIS ELDER, in her | ) | |
| individual and official capacity as Senior | ) | |
| Deputy Attorney General, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES Plaintiff Sonya Calloway-Durham ("Plaintiff" or "Calloway-Durham") by and through the undersigned counsel, and amends her Complaint as follows:

## NATURE OF THE ACTION

1.     This is an action under 42 U.S.C. § 1983 to correct unlawful, discriminatory employment practices by the individual defendants in their individual capacities against Plaintiff on the basis of race, color, and sex and subsequent retaliation for complaining about race, color, and sex discrimination.  This is also an action under 42 U.S.C. § 1981 to correct unlawful discriminatory employment practices by the individual defendants in their individual capacities against Plaintiff

on the basis of her race and color. This is also an action brought under 42 U.S.C. § 1985(3) against the individual defendants for conspiring to deprive Plaintiff of her civil rights and causing Plaintiff injury

2. This is also an action under Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e et seq.) to correct unlawful, discriminatory employment practices by the N.C. Department of Justice and the individual defendants in their official capacities on the basis of race, color, and sex and subsequent retaliation complaining about race, color, and sex discrimination.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff is an individual, over the age of eighteen. She is employed as a career State employee, by Defendant N.C. Department of Justice at the time of the acts alleged in this Complaint in Raleigh, North Carolina. Plaintiff lives in Granville County.

4. Defendant N.C. Department of Justice (NC DOJ) has been and is now an agency of the State of North Carolina, is located in Wake County, and was the employer of Plaintiff at all relevant times.

5. Joshua H. Stein ("Stein") is a White male and the elected Attorney General of the State of North Carolina and head of the NC DOJ, which is located in Wake County.

6. Leslie Cooley-Dismukes ("Dismukes"), who identifies as a White female, is the Criminal Bureau Chief of the NC DOJ, and serves at the pleasure of Stein.

7. Shannon John Cassell ("Cassell"), who identifies as a White female, is both the former Special Counsel to the Chief Deputy Attorney General, and Civil

Bureau Chief of the NC DOJ, and remains an employee of the NC DOJ, on information and belief on contract, and has served at the pleasure of Stein.

8.      Alana Danielle Marquis Elder ("Elder"), who identifies as a White female, is supervised by Dismukes, is the head of the Criminal Division, and supervises four section or department heads: Criminal Appeals, Appellate and Post-Conviction Section, Special Prosecutions and Law Enforcement, and Public Safety. Prior to becoming Division Head, the sections had been called the Appellate Section, the Law Enforcement Liaison Section, Capital Litigation and Federal Habeas Section, and the Public Safety Section. Elder also serves at the pleasure of Stein.

9.      All of the individual defendants were at all relevant times employees and agents of the Defendant NC DOJ and exercised either direct or indirect supervisory authority over Plaintiff which allowed them to dictate legal decisions in all  matters civil and criminal in the agency.

10.     Upon information and belief, Stein was aware of the decision not to promote Plaintiff before it was made and approved of it both after it was made and while Plaintiff was appealing the decision through the internal grievance process. He could have reversed the decision if he believed it to be wrong or otherwise provided recompense to Plaintiff to make her whole, but did not.

11.     Defendants Cassell, Dismukes, and Elder all participated in the grievance hearing at which Plaintiff sought to have the agency reconsider its decision not to promote her and all voiced support for and agreement with her non-selection.

12.     Defendant Stein was aware that Plaintiff was being subjected to a hostile work environment after she filed her grievance by Defendants Dismukes,

Cassell, and Elder and was deliberately indifferent to it or tacitly approved of it.

13. As members of management at the NC DOJ, Defendants all conspired in violation of § 1985(3) to deprive Plaintiff of her civil rights.

14. This Court has jurisdiction over Plaintiff's Title VII, and Plaintiff's §§ 1981, 1983, and 1985(3) claims under 28 U.S.C. §§ 1331 and 1343(4), and 42 U.S.C. § 2000e-5(f).

15. The acts which are the subject of this action and alleged to be unlawful were committed in the Eastern District of North Carolina.

## STATEMENT OF CLAIMS

16. More than thirty (30) days prior to the institution of this lawsuit, Plaintiff filed a Charge with the Equal Employment Opportunity Commission alleging violations of Title VII by Defendant. Plaintiff was issued a right to sue letter on June 17, 2021. All conditions precedent to the institution of this lawsuit have been fulfilled.

17. Defendants denied Plaintiff promotion based on her race, color, and sex in violation of Title VII and §§ 1981, 1983, and 1985(3).

18. Defendants also subjected Plaintiff to a hostile work environment and retaliated against Plaintiff in job assignments, job duties, the ability to make decisions in her legal work, and job evaluations after she complained about unlawful discrimination based on her race, color, and sex, in violation of Title VII, §§ 1981, 1983, and 1985(3).

## STATEMENT OF FACTS

19.    Plaintiff is a dark-skinned African American/Black female born in 1968 who has been employed by the NC DOJ as a career employee since January 2002.

20.    Plaintiff graduated from law school in May 1995 and passed the State Bar in July 1995.

## PLAINTIFF'S EXPERIENCE

21.    Prior to coming to work for the NC DOJ, Plaintiff was in private practice for 6 ½ years and while in law school, worked under the Third Year Practice Rule for approximately a year, where she gained experience litigating personal injury claims. This experience was useful to Plaintiff when defending tort claims against the State. Plaintiff also was an experienced litigator in other areas, including prosecuting child support, custody, visitation and divorce matters; representing individuals in various special proceedings including name changes, incompetency hearings, dis-interments and re-interments, expungements, and legitimations; defending child support contempt claims; defending and prosecuting claims regarding domestic violence; litigating various contract and quasi-contract claims such as claim and delivery violations; defending and prosecuting landlord tenant actions; defending unemployment issues before the Employment Security Commission; litigating various torts such as fraud, intentional infliction of emotional distress, negligent handling of a corpse; litigating unfair and deceptive trade practice claims; defending juvenile respondents in delinquency proceedings; defending respondent parents in juvenile proceedings; defending traffic offenses, criminal misdemeanors and felonies up to class C [bench and jury]; representing numerous defendants on motions for appropriate relief, and drafting and probating wills.

22. Plaintiff also had experience supervising third year practice students at the University of North Carolina at Chapel Hill Law School, supervising independent contractors who assisted her with clerical and paralegal duties, and working as a de facto team leader by directing legal and factual decisions as well as training Guardian ad Litem volunteers when working as a Guardian ad Litem Attorney Advocate.

23. Plaintiff was initially hired to perform mostly civil work in the Labor Section of the Civil Division in the NCDOJ as an Assistant Attorney General. In that position, Plaintiff was directly supervised initially by Ralf Haskell, and then Victoria Voight, and indirectly supervised by Reggie Watkins, Senior Deputy Attorney General, who supervised Haskell and then Voight, and was head of the Civil Division.

24. Between January 2002 when she was hired and mid-December 2011, when Plaintiff left the Labor Section and Civil Division, Plaintiff gained experience representing the State in various matters, including: representing the Occupational Health and Safety Division of the North Carolina Department of Labor before the North Carolina Occupational Safety and Health Review Commission in complex matters involving expert witnesses, issues of first impressions resulting in legislative change, multi-state settlements, frequent use of interpreters, and lengthy hearings; assisting the public with a variety of personnel issues such as Wage and Hour violations, Fair Labor Standard violations, Retaliatory Employment Discrimination Act [REDA] violations, including litigation, document review, document drafting, pre-citation review; problem solving complex abatement issues; training compliance officers at the Department of Labor on the legal implications of their duties; advising the Department of Labor on various issues requiring legal interpretations of federal

regulations and state codes and statutes, and state and federal cases; representing the Department of Labor when attending staff and client meetings; researching and advising regarding controlled substance testing in the workplace and Right to Know issues; representing the Department of Justice and the Department of Labor in employment disputes in the Office of Administrative Hearings, the State General Courts of Justice, the Federal District Court for Eastern District of North Carolina, the Fourth Circuit, and the United States Supreme Court; and representing the State in criminal appeals in both the N. C. Court of Appeals and the North Carolina Supreme Court, including oral argument(s) with an emphasis on child abuse/sex crimes.

25.     In December 2011, Plaintiff was promoted to a Special Deputy Attorney General and hired into a section then known as the Capital Litigation and Habeas Corpus (Cap Lit) section in the Criminal Division. She was directly supervised by Defendant Elder, then Section Head, who was supervised initially by William [Bill] H. Hart, Sr. and then by Robert Montgomery, Criminal Division Senior Deputy Attorneys General, who had replaced Bill Hart as the head of the Criminal Division.

26.     In that position, Plaintiff performed mostly criminal work, which included: assisting local District Attorneys in the investigation, briefing and handling of complex post-conviction capital litigation at the Superior Court level; advising and assisting with questions of law and legal procedures relating to the prosecution and appellate review of capital and non-capital cases; representing the State of North Carolina on discretionary review of such post-conviction proceedings before the North Carolina Supreme Court and the Supreme Court of the United States; representing

the State on subsequent federal habeas review of capital cases related to the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] in the United States District Court system, the Fourth Circuit (including oral argument) and the United States Supreme Court; representing the State of North Carolina in the criminal appeals of first degree murder convictions, including oral argument before the N.C. Court of Appeals; and advising and assisting other Department of Justice attorneys in the appellate briefing and argument of capital and non-capital cases before the N. C. appellate courts.

## THE STEIN ADMINISTRATION

27.     In November 2016, Stein was elected Attorney General and replaced Roy A. Cooper, Jr. who was elected Governor. In January 2017, Stein was sworn in.

28.     In July 2017, the General Assembly cut NC DOJ's budget by approximately $10 million.

29.     Despite the budget cut and attritions required as a result, in December 2017, Defendant Dismukes who was not yet 40, was hired as the Criminal Bureau Chief, a new    position created by the Stein Administration, which created an additional level of supervision above the existing Criminal Division Senior Deputy Attorney General, Robert Montgomery.

30.     In November 2017, David J. Adinolfi, II, the head of the Special Prosecutions Section, was "realigned" from his section head position, and in January 2018 reclassified to an Attorney III. In March 2018, upon information and belief, his physician removed him from work for high blood pressure in the stroke range. In November 2018, he filed a lawsuit alleging age discrimination, hostile work

environment, failure to accommodate, and retaliation. *See Adinoff v. N.C. Dep't of Justice*, 5:18-CV-539-FL.

31.     Between July 2017 and January 2018, Defendant Elder came to Plaintiff several times advising her that because of ongoing "realignments" she was working to get Plaintiff transferred into the Appellate Section. Subsequently, Plaintiff spoke to David Elliott, who at that time worked in upper management at NCDOJ and confirmed that no such plan was in place and that if such a plan was in place or was being considered, he would have known about it as a member of upper management.

32.     On January 31, 2018, Sandra Wallace-Smith (Wallace), an attorney in the Cap Lit section had a heart attack while at work, and upon information and belief her stress levels played a role in the attack, which are rumored to be related to stress caused by working for Defendants Elder and Dismukes.

33.     Wallace came to Plaintiff for help during her heart attack. Despite Plaintiff's pleas to call 911, Wallace insisted on going to the doctor after work. Plaintiff   assisted Wallace with care until she was able get in contact with Wallace's husband and Plaintiff   talked her into going to the hospital. Wallace's husband.  met Plaintiff outside the NC DOJ building, and transported his wife to a local hospital, where she underwent immediate open-heart surgery. but.

34.     The day of the heart attack, after Plaintiff had confirmation from Wallace's husband that it was indeed a heart attack and that she had gone into immediate surgery upon arrival at the hospital, Plaintiff found Elder, Wallace's and Plaintiff's supervisor, and told her what happened. Instead of showing concern, Elder asked Plaintiff how she knew it was a heart attack. Plaintiff explained that Wallace's

husband had just told Plaintiff that Wallace had suffered a heart attack.

35.     Apparently, Elder needed to confirm Plaintiff's story with Wallace's husband and so she called him. Elder subsequently came to Plaintiff's office and stated, "I just want you to know, I talked to Andre and he informed me that she did in fact have a heart attack. You'll be hearing from HR on whether or not you broke protocol by not calling 911."

36.     Not only did Elder demonstrate no concern for Wallace, but she also demonstrated no concern for Plaintiff and her experience trying to assist a colleague who was clearly gravely ill. Plaintiff was so upset by Elder's veiled threat that Plaintiff might be reprimanded for her actions, Plaintiff packed up her belongings and left work, crying the entire way home due to the stress of the events of the day and the emotional abuse by Elder.

37.     Plaintiff returned to work the next day and found that Defendant Elder was apparently not satisfied with the emotional abuse to which she had already subjected Plaintiff. Defendant Elder, along with Defendant Dismukes, called an emergency meeting to discuss what happened in front of the entire Criminal Division. Prior to the meeting, Plaintiff had no idea what the meeting was about.

38.     At the start of the meeting, Dismukes indicated Elder had a few words. Elder then began yelling, "For those of you who don't know, Sandra Wallace Smith had a massive heart attack on the job yesterday. I have spoken to her husband, and she has given me permission to tell you this, so there's no HIPAA violation," (demonstrating a lack of understanding of HIPAA). Elder then stated, inaccurately, that Wallace "was taken by car to the hospital by one of our employees in their

personal vehicle. We do not want a repeat of what happened. If someone comes to anyone of you while having a heart attack, you are COMMANDED to call 911."

39.     Plaintiff was shocked at being called out in front of the entire criminal division. Plaintiff then left the room, called David Elliot to see if he was available, and then sat in his office and cried for approximately two hours explaining what had happened and why she was so angry and upset. Elliott told Plaintiff to take the rest of the day off.

40.     Upon Plaintiff's return to work, one of the paralegals told Plaintiff that the afternoon of the heart attack, Defendant Elder had asked both the paralegal and another lawyer if they thought Plaintiff was telling the truth. The paralegal replied that Plaintiff had been very upset, and the lawyer noted that Plaintiff looked shaken and that he was worried about Plaintiff based on her appearance.

41.     Although Plaintiff was chastised by Defendants Elder and Dismukes for assisting Wallace during her medical emergency, by contrast, in a department wide newsletter, a younger white attorney was later praised by Defendant Stein for acting "quickly to help a fellow DOJ colleague in an emergency."

42.     In February 2018, Robert Montgomery, who served at the pleasure of Stein, resigned his position as Senior Deputy Attorney General. It was rumored that he was going to be ousted as the Criminal Division head. He was replaced by Defendant Elder, who then reported directly to Defendant Dismukes.

**PLAINTIFF'S MOVE TO PUBLIC SAFETY SECTION (SPRING 2018)**

43.     Immediately following Wallace's heart attack, Defendant Dismukes came to Plaintiff and informed her that she had a position in mind for her in which

she would be in charge of "all things satellite-based monitoring" for the State of North Carolina. Satellite-based monitoring or SBM is post-release condition imposed by the trial court for certain sex offenders, which is implemented by the North Carolina Department of Public Safety (NC DPS). She also informed Plaintiff that she and Defendant Elder had discussed the matter and felt Plaintiff would be perfect for the job. Defendant Dismukes also explained that the job would entail working in the Public Safety Section (PS Section) under Joseph Finarelli (Finarelli).

44.     Plaintiff explained that she had only handled one SBM case in her prior appellate work emphasizing sex crimes but agreed to take the job on the condition that she would be able to maintain two of her Cap Lit cases that were in the middle of discovery and negotiations, and on the condition that she remain on the appellate rotation for direct appeals in murder cases. Defendant Dismukes informed Plaintiff that her terms were agreeable and that there was no hurry to move her office.

45.     Upon agreeing that she would take the position in the PS Section, Finarelli immediately informed Plaintiff that she had been misinformed about the work she would perform in the section. He informed her that the satellite-based monitoring (SBM) work was "part-time" and that she would have to take on a regular case load like the other attorneys in the Public Safety Section.

46.     Plaintiff informed Finarelli that there were no other Attorney IV's in his section and as such, she believed that doing Attorney III work such as he suggested would be a demotion. Finarelli advised Plaintiff that Defendants Dismukes and Elder had instructed him that he was not to have a case load. Finarelli then asked Plaintiff about her comfort level in representing the Parole Commission which was a majority

of his caseload along with SBM, and had not been assigned to an Attorney

III. Plaintiff agreed to handle Parole Commission cases.

47.    Plaintiff again contacted David Elliott, who advised Plaintiff that he spoke to Defendant Dismukes and advised Dismukes that "she could not do that" by which he meant require Plaintiff to litigate the same case load as the lower-level attorneys in the PS section such as the inmate litigation cases, most of which were filed by pro se inmates.

48.    Defendant Dismukes returned to Plaintiff, confirmed that David Elliot had spoken to her, and advised Plaintiff that Finarelli simply was mistaken.

49.    Defendant Cassell was hired in March 2018 as "Special Counsel to Chief Deputy Attorney General."

50.    In April 2018, Plaintiff moved her office from Cap Lit to the Public Safety Section. While Plaintiff began handling SBM cases and cases involving the Parole Commission, Finarelli began assigning Plaintiff federal inmate cases that were Attorney III duties.

51.    Almost immediately after joining the Public Safety Section, the General Counsel for NC DPS, Jane A. Gilchrist, requested Plaintiff's assistance in representing NC DPS in two complex OSHA matters involving four fatalities. As a result, Plaintiff began litigating that matter and also began representing NC DPS on all matters involving OSHA.

52.    Also, in April 2018, Plaintiff discovered that there had been a pivotal United States Supreme Court decision in which the Court had determined that North Carolina's SBM was a "search" under the Fourth Amendment. *See Grady v. North*

*Carolina*, 575 U. S. 306 (2015). As such, Plaintiff discovered that the issue of SBM was quite complex and difficult to defend instead of being "part-time" work as represented by Finarelli. Within months, Plaintiff began responding to several briefs at once.

53. In May 2018, after being out of work 90 days, Wallace returned to work. Defendant Elder required Wallace to accompany Plaintiff to Fayetteville, where Plaintiff was handling a deposition in one of the two cases Plaintiff had maintained, even though Wallace was still recovering from her heart attack, and Plaintiff was a seasoned litigator. During and after the deposition, Plaintiff noted that Wallace was observably unwell.

54. Following the deposition, the current section head of Cap Lit (Appellate and Post-Conviction), Jonathan Babb (Babb) came to Plaintiff and informed her that a decision had been made for her to give back the two files she had kept as promised by Defendant Dismukes. Plaintiff advised that she was told otherwise, and Babb responded, "You're going to give back those files."

55. Wallace then came to Plaintiff and advised Plaintiff that Wallace had been instructed to pick up the files from Plaintiff. Plaintiff handed over the files to Wallace, but as a courtesy to Wallace, Plaintiff unofficially continued to assist Wallace with them, as well as other cases Wallace inherited from Plaintiff, until Wallace's retirement in December 2020.

56. On May 25, 2018, Arthur Yancey, an Attorney III in the Medicaid Investigations Section in the Criminal Bureau, died of a massive heart attack in the parking lot at his office, after a work meeting regarding the implementation of

-14-

changes, after which, upon information and belief, he was upset and at which Defendant Dismukes had been in attendance.

### CHANGE IN PS SECTION HEAD: FINARELLI TO HILL (JULY 2019)

57.     In July 2019, Finarelli was "realigned" to the Civil Bureau in a non-management position, and informed the Public Safety Section, that he was forced to leave. Plaintiff noted that he was visibly upset and that he began to cry. Defendants Dismukes and Elder were present for the meeting, and Defendant Elder indicated during the meeting, "At least he's not gone on to be with Jesus."

58.     Defendants Elder, Dismukes and Cassell shared responsibility for supervising the PS Section following Finarelli's immediate departure.

59.     Tammera S. Hill (Hill), who identifies as a Black female, and was in her late 40's, was then "realigned" from section head of the Law Enforcement Liaison Section to become section head of the PS Section. Hill indicated to Plaintiff that she was not happy about the "realignment," as she previously had worked in the Public Safety Section, and did not want to return, because she enjoyed her work in Law Enforcement Liaison. Hill also indicated to Plaintiff that Hill did not believe she had a choice.

### "REALIGNMENTS" IN NC DOJ, THE CRIMINAL DIVISION, AND DEPARTURES FROM THE PS SECTION CONTINUED

60.     Cheryl Perry, who identifies as a Black female, also an Attorney III, was "realigned" from the PS Section and was moved to work in house for the client, NC DPS near the end of 2018.

61.     In February 2019, Tamika Henderson, who identifies as a Black female, left the PS Section and was promoted as an Attorney V to the Special Litigation (Spec.

Lit.) Section in the Civil Division.

62.    In August 2019 both Dan O'Brien (section head) and Janet Johnson-Cook (lead paralegal in the Criminal Appeals section) were "realigned" from the Appellate Section to a newly created Criminal Appeals department. Upon information and belief, Johnson-Cook was not aware of her "realignment" until a meeting with the entire section when she asked, "What about me?" (On March 14, 2020, following the onset of a series of heart-related issues in the prior weeks, Johnson-Cook died from sudden cardiac arrest.)

63.    In October 2019, Corrine Lusic left the PS Section for a position at the Administrative Office of the Courts.

64.    In or about December 2019 and January 2020, Alexander McC. "Alec" Peters, the then Chief Deputy Attorney General, who served at the pleasure of Stein, also suffered a heart attack, and Defendant Cassell took over his job duties until his return. (Upon information and belief in January 2021, he made the decision to retire after being forced out by Stein.)

65.    In February 2020, Yvonne Ricci, who identifies as a Black female, left the PS Section and transferred laterally to the Department of Transportation Division as an Attorney III.

66.    In August 2020, Terrence Steed left the PS Section and was promoted to a position in Spec. Lit. His departure was followed in September 2020, by Orlando Rodriguez' departure from the PS Section for Spec. Lit.

67.    In May 2021, Norlan Graves, a Black male, removed his name from consideration for a position in Spec. Lit. to accept a newly created position in PS as

-16-

an Attorney IV.

68.     Each of the employees who left the PS Section for Spec. Lit retained cases from the PS Section, including cases which were related to two highly contested OSHA cases in which Plaintiff was representing NC DPS. Plaintiff was told by Defendant Cassell first that she could not speak with witnesses who were defendants in the other cases. Subsequently, Cassell added a prohibition that Plaintiff could not discuss the facts with the attorneys on the other cases either. Plaintiff knew that these prohibitions were designed to hamstring Plaintiff in representing her client.

## CHANGE IN PS SECTION HEAD: HILL LEFT FOR NC DPS (MAY 2020) AND PLAINTIFF APPLIES FOR SECTION HEAD POSITION (JUNE 2020)

69.     In or about May 2020, Hill informed the PS Section that she was leaving the section to work for NC DPS. The section head position was posted on May 27, 2020.

70.     On or about June 4, 2020, Plaintiff applied for the Section Head, Public Safety (Attorney Manager II), but did not inform anyone in the PS Section of her intent to apply, including Hill.

71.     On June 17, 2020, Plaintiff was notified another applicant had been selected and accepted the position at NC DOJ for which she had applied and interviewed.

72.     The selected applicant, James Trachtman, who identifies as a male and was born in March 1968, had the same number of years of experience as a lawyer as Plaintiff, having also become licensed in July 1995, but had never represented NC

DPS or any of its divisions prior to his being hired in or about August 2019, some nine months before his promotion. His experience was related to civil matters involving corporate law.

73.    In addition, Trachtman was classified as an Attorney III at the time of his promotion, and Plaintiff was classified as an Attorney IV, two levels below the Attorney Manager II position. Although the classification of Attorney V existed, it was created after Stein became Attorney General, and there are no Attorney V's in the Criminal Division. Thus, Trachtman was promoted two pay grades over Plaintiff.

74.    In addition, at the time of her application, Plaintiff had nearly equal amounts of civil and criminal experience, including both trial and appellate work.

75.    At the time of her application, Plaintiff's civil litigation experience included: handling very large cases with multiple parties; conducting detailed discovery; winning motions for summary judgment in both state and federal courts; litigating matters in forums ranging from small claims to Superior Court, all three United States District Courts in North Carolina, the Fourth Circuit and two cases before the United States Supreme Court, in a variety of areas including but not limited to employment law, federal and habeas (hybrid civil and criminal in nature), family law, personal injury, traffic law, landlord tenant law, SBM, Section 1983 claims, juvenile abuse and neglect petitions, various torts, various contract and quasi-contract claims, various special proceedings, constitutional issues related to post-release supervision and parole; obtaining favorable judgments after bench trials/hearings, some of which lasted weeks at a time, and administrative venues

including OAH, the Employment Security Commission, and the NC Occupational Safety and Health Review Commission.

76.     At the time of her application, Plaintiff's criminal litigation experience included: prosecuting and defending matters ranging from misdemeanor traffic infractions to felony death sentences; defending and prosecuting motions for appropriate relief in matters ranging from traffic offenses to non-capital murders, juvenile delinquency defense; defending at least one jury trial that lasted several days; handling civil constitutional matters with overlapping criminal procedure issues ranging from Pre-Fair Sentencing, Fair Sentencing, Structured Sentencing, paper parole, prison credits, parole eligibility, parole revocation, parole termination, frequency of parole for certain offenses and certain offenders, conditions of parole, factors for parole consideration, the implication of MAPP agreements, implications of the transcript of plea and parole, implications of the transcript of plea/factual basis and SBM, implications of conditions for work release and assessing damages in 1983 claims, the implications of consolidated judgments and the length of multiple sentences, implications of fingerprint records and expungements, implications of habitual felon status and the length of multiple sentences, implications of non-liberty rights and state habeas claims, and arguing motions in person in front of numerous District and Superior Court judges in 35 of the 100 counties of the State.

77.     At the time of her application, Plaintiff's appellate experience, civil and criminal, included: handling civil and criminal appeals in both the state and federal courts, including, but not limited to the NC Court of Appeals, NC Supreme Court,

Fourth Circuit Court of Appeals, and the United States Supreme Court; arguing in front of the NC Court of Appeals and the Fourth Circuit; and averaging at least one published opinion a year, and with favorable results.

78.    At the time of her application, Plaintiff's experience in the PS Section included: serving as the main point of contact at NCDOJ for all matters related to SBM; representing the NC DPS in matters involving corrections law and conditions of confinement for two years; a level of knowledge of lethal injection protocols administered by NC DPS from her more than six years handling complex death penalty litigation death-related cases; knowledge regarding death-related litigation which required that expertise in reading and synthesizing medical reports, including, but not limited to autopsies, due to work in cases involving fatalities in OSH cases, work on DSS cases involving fatalities as a GAL Attorney Advocate, first-degree murder appeals, and death penalty litigation; expertise in the preparation and use of expert witnesses in litigation involving fatalities; expertise in representing the State in a case with more than two dozen plaintiffs involving the NC Emergency Management Act, which is implemented by the NC DPS; representing and advising NC DPS regarding OSHA matters; demonstrating a rapport with various District Attorneys, who sought Plaintiff's legal advice on other matters; demonstrating a rapport with various department heads at NC DPS and other agencies regarding probation/post-release supervision/parole matters, NC Highway Patrol matters, Emergency Management matters, National Guard matters, Safety Director matters, Prison Facility matters, NCDOT condemnation and engineering matters; knowledge

of the inner workings of the Motor Carrier Unit of the Highway Patrol administered by the NC DPS; negotiating and settling multiple cases involving thousands and sometimes hundreds of thousands of dollars; and expertise in representing the State for eight years in the most complex criminal appeals, e.g. first-degree murder cases which often have thousands of pages in transcripts and rooms full of exhibits, which are often necessary to synthesize in order to apply the facts of the case to the law.

79.    Plaintiff's knowledge of both criminal law and procedure was particularly valuable to the position for which she applied, because the statutory responsibilities of the NC DPS involved obligations imposed by both civil and criminal law; and litigation involving the agency often involved both criminal and civil law expertise and knowledge.

80.    At the time of her application, Plaintiff also had years of experience mentoring other employees, supervising law students, and working as lead attorney in various capacities both in private practice and in public service at the NC DOJ.

81.    At the time of her application, Plaintiff was more than qualified for the PS Section Head (Attorney Manager II) position and actually had broader and more extensive knowledge and experience than anyone else in the Office of the Attorney General with regard to the NC DPS.

82.    But for the combination of her race, dark skin, sex and age, Plaintiff would have been promoted as section head.

83.    Even though the decision makers in the promotion decision were Defendants Division Head Elder and Criminal Bureau Chief Dismukes, both women,

they apparently were uncomfortable supervising someone with Plaintiff's race, dark skin, sex and age, given her experience, expertise, and skillset.

**PLAINTIFF GRIEVES DENIAL OF PROMOTION; RETALIATION ENSUES**

84.     On June 29, 2020, Plaintiff filed a grievance, challenging the decision to promote Trachtman over Plaintiff. After she filed her grievance, the acts which had previously created a hostile work environment for her due to her race and sex intensified as a result of Defendants' retaliatory actions.

85.     Sometime after Trachtman received the position, Plaintiff spoke to Hill, who informed Plaintiff she was shocked Plaintiff applied, given Plaintiff knew about Hill's own unhappiness with the position. Hill informed Plaintiff that she "wouldn't want that for [Plaintiff]."

86.     Hill also advised Plaintiff that she had spoken to Defendants Elder and Dismukes, during the selection process, and Defendants Elder and Dismukes asked her if there was anyone in the PS Section that Hill would recommend for the position. Hill informed Plaintiff that she informed Defendants Elder and Dismukes that she would recommend Trachtman. Hill explained to Plaintiff that her statement was not intended as a reference against Plaintiff's application, as she did not know Plaintiff had applied, nor did it ever occur to Hill that Plaintiff would apply.

87.     After Plaintiff challenged her denial of promotion, DOJ management engaged in a campaign to sabotage her successes and undermine her representation of her clients in her criminal appellate cases, her SBM cases, at least two state habeas cases, and her high-profile OSHA cases for NC DPS in order to shore up their intended defense in the non-selection grievance that she was a sub-par and

incompetent lawyer.

88.     Moreover, although Plaintiff was accustomed to receiving three to four direct appeals a year, Plaintiff was assigned only one direct appeal involving first-degree murder between her filing of her grievance and the date of this complaint, *State v.Timothy Roger Best*, NCCOA 20-543, which she received in or about August 2020 and successfully appealed. Plaintiff's SBM cases were not part of her appeal rotation, as they were part of her duties in representing NC DPS. Defendants Elder, Dismukes and Cassell refused to allow Plaintiff to have the assistance of a transcriptionist for SBM cases that also involved other issues related to sex offenses against children. The crux of the State's cases in question, were non-transcribed but recorded interviews of children conducted by trained social workers. Due to the number of cases Plaintiff was handling and the inability to understand the children in question (some of whom spoke other languages and at least one had a lollipop in her mouth while she spoke), Plaintiff had neither the time nor the ability to argue the merits of the non-SBM assignments of error, without a transcript of what the children actually divulged.

89.     Upon Defendants Elder, Dismukes, and Cassell's refusal to assist her, Plaintiff was forced to work sixteen-hour days while also paying out of pocket to hire someone to assist her in transcribing the recordings for her.

90.     Defendants Elder, Dismukes, and Cassell informed Plaintiff that a transcript was not necessary, and that "no one else" needed one.

91.     At one point Defendant Cassell offered a software program unrelated to transcribing, and Plaintiff informed her that if Plaintiff could not understand the

children, a computer program would be of little assistance; and would likely mean she would have to take the time to listen word-for-word for mistakes.

92.     Following the filing of her grievance on June 29, 2020, Plaintiff noticed that Defendant Elder began disallowing Plaintiff to petition for discretionary review, even in published opinions that reversed or vacated SBM orders. This was in stark contrast to the independent decision-making authority enjoyed by most, if not all lawyers, with Plaintiff's same expertise and experience.

93.     On July 1, 2020, Plaintiff received notice that Defendant Elder had forbidden Plaintiff from filing a petition for discretionary review of the published opinion in *State v. Hutchens*, 272 N.C. App. 156, 846 S.E.2d 306 (2020).

94.     Plaintiff noticed the trend even when the elected District Attorneys indicated their desire to petition for review. For example, in July 2021, Defendant Elder forbade Plaintiff to file a petition for discretionary review following the published opinion in *State v. O.C. Billings*, 2021 NCCOA 306, 2021 N.C. App. LEXIS 341 (July 6, 2021), despite the insistence of the elected District Attorney that the case be appealed. Consequently, cases like *Billings*, whether published or unpublished, have proven to be an obstacle in Plaintiff's attempt to represent the State in SBM cases, because Defendants raise the cases regularly regardless of their lack of mandatory authority with the North Carolina Court of Appeals.

95.     Defendant Elder has only approved discretionary appeals where they can "piggy back" an appeal assigned to another attorney. In effect, Defendant Elder has prevented Plaintiff from petitioning for review based on the merits of her own cases.

**PLAINTIFF WAS ASSIGNED HABEAS CASES BUT DEFENDANTS
INTERFERED WITH HER ABILITY TO SUCCESSFULLY DEFEND THEM**

96.     Also in late July 2020, after Plaintiff filed her grievance, Defendant Dismukes insisted on traveling to Superior Court in Durham, North Carolina, to accompany Plaintiff who was arguing a state habeas matter. At the hearing, Defendant Dismukes spoke over Plaintiff, the Court, and opposing counsel, and argued erroneous points of law. At one point the Court stopped asking Dismukes questions and directed all of its questions to Plaintiff. Witnesses remarked to Plaintiff that Dismukes had embarrassed herself in her arguments to the Court.

97.     In August 2020, after Plaintiff's response to the state habeas petition e had been reviewed and approved by Trachtman, Defendants Elder and Dismukes rewrote Plaintiff's response.

98.     Plaintiff advised Defendants Elder and Dismukes that she was unwilling to sign her name to the revised response because the response did not accurately state the law and because she did not want to repeat the experience of late July. Plaintiff did not think it wise to sign her name on the revised brief or become obligated to make arguments that did not appropriately explain the law based on the facts.

99.     Around this same time, in another habeas case, an unfavorable decision was issued. Given the trial court's decision against NC DPS in the state habeas case involving the pending issue of certiorari, opposing counsel filed a motion for attorney fees, which Plaintiff successfully defended, and no fees were awarded.

100.     Finally, in a case involving the issue of consolidated judgments and the ex post facto application of the SBM Program, which together were (incorrectly)

alleged to be state constitutional liberty violations, another unfavorable decision was rendered and in July Plaintiff sought to file a petition for writ of certiorari for her client NC DPS.

101.   In August 2020, Defendants Elder and Dismukes informed Plaintiff that she would not be allowed to petition for writ of certiorari on behalf of NC DPS in a state habeas case.

102.   Plaintiff discussed the matter with NC DPS General Counsel, who indicated that she wanted the case appealed. The General Counsel for NC DPS then advised Defendants Elder and Dismukes that she believed it was in the best interest of NC DPS to petition for writ of certiorari in the case.

103.   Alec Peters, Defendant Stein's Chief Deputy, informed Plaintiff, Defendants Elder and Dismukes, that he would make the decision on whether the Plaintiff could file the petition for writ of    certiorari in the case.

104.   While awaiting a decision from NC DOJ, in October 2020, Plaintiff again raised with Defendant Elder the issue of the pending petition for writ of certiorari, and Elder informed her, "You've been told no, and yet you keep asking."

105.   It was not until in or about January 2021 that Plaintiff received notice that she would not be allowed to petition the North Carolina Court of Appeals for certiorari, again, based on the same erroneous analysis adopted by Defendants Elder and Dismukes that Plaintiff had attempted to explain was not the appropriate analysis for the issue.

106.  In or about January 2021, General Counsel for NC DPS repeated her position, and added that the order meant there was the potential for NC DPS to be civilly liable to the habeas petitioner; and the length of time that had passed without NC DOJ informing NC DPS of its decision not to pursue certiorari, had been detrimental to the likelihood that the North Carolina Court of Appeals would grant certiorari, even if NC DPS hired outside counsel.

107.  During the hearing in open court in July 2020 regarding attorney fees in the state habeas case which was still awaiting a decision by NC DOJ as to whether Petitioner would be allowed to petition for certiorari, the Court inquired of opposing counsel whether NC DPS had indicated any intent to appeal its order.

108.  In or after August 2020, Defendant Dismukes forbade Plaintiff to handle any additional state habeas cases, even though there was no one else in the PS Section who had prior knowledge of the issue; and no one outside of the PS Section of whom Plaintiff is aware, with knowledge to handle the state habeas matters without assistance. Plaintiff also became aware that when state habeas cases were assigned to others, Plaintiff was not included on the emails, nor was she asked for her advice when problems arose.

109.  Defendant Cassell forbade anyone involved as a party in the companion cases to Plaintiff's high-profile OSHA matters, e.g., wrongful death cases, to speak with Plaintiff. As a result, Plaintiff was forced to do her own investigation and find witnesses and documents unknown to the attorneys in Spec. Lit. Section, who had kept those cases with them when they transferred from PS Section to the Spec. Lit.

Section.

110.    In addition, Plaintiff began to notice that in the DOJ newsletters and updates distributed to DOJ employee, she seemed to be invisible. Though she had accomplishments similar to her colleagues and peers, her accomplishments were studiously overlooked, while other DOJ employees were praised, congratulated, and recognized for their successes. These newsletters contained much information about the work of NC DOJ attorneys and personnel actions including promotions and upon information and belief, Defendant Stein read these, perhaps even provided input into them, and was aware and had knowledge of the goings on in his agency related to all of his employees.

111.    Plaintiff appealed the denial of promotion through the internal grievance procedure and a grievance hearing was held on October 26, 2020. Defendant Elder represented the DOJ and also testified at the hearing, along with Defendant Cassell and Dismukes.

### GRIEVANCE HEARING

112.    Elder introduced herself as the Senior Deputy over the Criminal Division at NCDOJ, and that she had been since 2018, and had previously been Section Head over the Capital Litigation Section where she was Plaintiff's supervisor for 6 years.

113.    The interview panel for the position consisted of Defendant Elder, Defendant Dismukes, and Tina Wong, from Human Resources.

114.    Elder testified that Plaintiff didn't like to be told what to do or to be supervised and that Plaintiff thought she knew everything. Elder then accused

Plaintiff of thinking that she was more qualified for the position simply because she had been with DOJ longer than Trachtman. Elder also stated that Trachtman had only been with DOJ for 9 months when he was promoted but that he "hit the ground running."

115. Elder then argued that Plaintiff was not doing work as complex as other lawyers with lower classification than Plaintiff and that Plaintiff was simply not as qualified as Trachtman nor even at the top of the pool of applicants interviewed, which were all white males.

116. Elder then added that Plaintiff had offended "them" with her answers during her interview when Plaintiff was asked her thoughts about how to manage clients. Plaintiff explained that she did not believe in "managing" clients because clients had their own managers. Plaintiff further explained that she believed in earning her clients' respect over time while learning whom to ask for assistance when needed. She believed this was the best way to work productively with clients and provide them representation and advice.

117. Elder also criticized Plaintiff for failing to offer ideas about how to make things better in the agency and stated that Trachtman had great ideas about how to make things better. Elder initially stated that the interview questions contained a question about how to make things better, but eventually Elder admitted that Trachtman had volunteered this information and that there was no question on the interview question list about how to make things better.

118. Elder also stated that she considered Plaintiff a poor writer. Plaintiff asked Elder whether it mattered that the courts routinely used Plaintiff's arguments

and language from her briefs in their opinions or orders. Elder stated it did not because judges don't work for DOJ and their opinions don't matter, it's what "they" (management) think.

119.    Elder continued to compare Plaintiff to both Trachtman and Tammera Hill, a black female, the previous section head and stated that "Jamie and Tammera did "stellar work" but that Plaintiff's work was only "good."

120.    Elder stated that Plaintiff's positive results with the court system had no bearing on her opinion of Plaintiff which was that Plaintiff was not capable of handling complex work.

121.    Defendant Elder further defended her position that Plaintiff was a poor writer stating that that she "had to correct" Plaintiff's writing in a United States Supreme Court Brief. In fact, the language corrected by Elder had been borrowed by Plaintiff from a senior attorney and former section head with the NC DOJ, who was on the capital murder direct appeals rotation, and had written numerous briefs to the United States Supreme Court.

122.    During Plaintiff's grievance hearing, Defendant Cassell stated that there was nothing for which she would recommend Plaintiff; that Plaintiff was an embarrassment to the agency; that Plaintiff was a prime example of lazy career employees who think they simply have to show up for work; that the first time she met Plaintiff, Plaintiff did not "come across as a person of very high intelligence;" that she could not understand how Plaintiff had remained at NC DOJ so long; that if had been left up to Defendant Cassell, Plaintiff would have been fired a long time ago; and that she could not understand how Plaintiff ever became a licensed attorney, let

alone how Plaintiff ever passed a Bar.

123. Defendant Dismukes also stated that "they" only assigned Plaintiff low level work because Plaintiff was not capable of handling complex cases.

124. At the hearing, Hill defended Plaintiff and stated her opinion that Plaintiff's twenty-five years of experience meant something; she disagreed that Plaintiff was unfit to be a supervisor; she stated that while Hill supervised Plaintiff, Hill relied on Plaintiff to handle complex matters about which Hill personally knew little; that it was untrue that Hill did not assign complex cases to Plaintiff; and that Plaintiff worked independently without guidance from other attorneys or "go-bys" on novel issues.

125. Victoria Voight, Plaintiff's former supervisor at NC DOJ in the Civil Division, stated at the grievance hearing that she promoted Plaintiff to an Attorney III; that she and Plaintiff had worked on complex personnel cases, one of which was appealed to the United States Supreme Court, and all of which had favorable results; that Plaintiff handled the most complex OSHA cases during her period of supervising Plaintiff; that at least one of Plaintiff's OSHA cases had led to a change in legislative law; and that she never had a problem with Plaintiff's writing.

126. Also at the grievance hearing, Gregory Stafford, a former classmate and private practice colleague, stated that Plaintiff was someone from whom he frequently sought advice and direction in his own criminal and civil cases; and that none of Plaintiff's advice had ever "steered him wrong."

127. Annie Harvey, former Deputy Director of Prisons at NC DPS, also testified at the grievance hearing that she had been named in a wrongful death

lawsuit, and that despite having worked at length with Plaintiff on the companion OSHA matters, Defendant Cassell had forbidden her to talk to Plaintiff about the case(s).

## POST GRIEVANCE HEARING RETALIATION

128.    In or about January 2021, Defendant Cassell, the current Civil Bureau Chief, Reuben Young (Young), a co-worker, Norlan Graves, and Trachtman met virtually about the high-profile OSHA matters. During the meeting, Defendant Cassell again forbade Plaintiff and Norlan Graves, who was working under Plaintiff's de facto supervision, to speak with the parties in the third-party/companion lawsuits. Defendant Cassell informed Plaintiff that Defendant Cassell did not want Plaintiff "messing up" the other cases; that the other cases were multi-million-dollar cases; and all Plaintiff and NC DPS General Counsel cared about were the criminal cases. There were capital murder cases pending as a result of the same set of facts involved in both the OSHA cases as well as the wrongful death cases.

129.    Plaintiff asked Defendant Cassell if Plaintiff understood her correctly, that it was NC DOJ's position that she was not to "try" the OSHA cases. Defendant Cassell did not answer; and Young responded that NC DOJ did not want Plaintiff to spend time unnecessarily preparing for a two-week hearing if the matter could be settled. Plaintiff responded that "that ship had sailed;" and that she had been preparing     for hearings in those OSHA cases since April 2018 when she received the assignment(s), including finding her own witnesses and evidence.

130.    In addition, multiple DOJ newsletters and updates were distributed after Plaintiff filed her grievance. Though she had accomplishments similar to her

131.    colleagues and peers, her accomplishments were studiously overlooked, while other DOJ employees were praised, congratulated, and recognized for their successes.

132.    On Plaintiff's 2020-2021 annual performance review, Plaintiff received a total score of 2.6 which equated to a 2 for having met expectations. A total score of 2.7 would equate to a 3 for having exceeded expectations, the highest allowed, and the requirement for merit-based bonuses, The Review was signed by Plaintiff on August 27, 2021, Trachtman on August 18, 2021, and Defendant Elder on August 3, 2021,

133.    Prior to signing the document, Plaintiff informed Trachtman that she believed her score was incorrect in that she received a 2 for Innovation and Creativity, when she had received a lone 3 for this category in her prior evaluation with Hill. Plaintiff informed Trachtman that Plaintiff was concerned it would be perceived that her innovation and creativity had decreased. Trachtman advised Plaintiff that was not his intent. He later informed Plaintiff that when he attempted to change the rating, he was informed he could not do so.

134.    Upon information and belief Defendant Elder, who was necessary to Plaintiff's review, refused permission for Trachtman to change the rating for innovation and creativity, which would have raised Plaintiff's overall score to 2.7 or greater, and therefore a 3 for having exceeded expectations.

135.    Defendant Elder was the first signatory on both annual evaluations following Plaintiff's grievance, neither of which gave Plaintiff, a Black female, more than a 2 for diversity and inclusion.

136. Plaintiff questioned Hill about her lone 3 in her 2019-2020 annual review with a total score of 2.1, signed by Hill on June 26, 2020, Plaintiff on August 14, 2020, and Defendant Elder on July 29, 2020; Hill informed Plaintiff that she had to "fight" to give Plaintiff the lone 3; and that Hill had informed her superior, Defendant Elder, that Hill did not see how Plaintiff was able to respond to some of the novel issues in her cases, except for her innovation and creativity.

137. The interactions between Plaintiff and Defendants Dismukes and Elder created a hostile work environment for Plaintiff because Defendants Dismukes and Elder had already testified at Plaintiff's grievance hearing in October 2020 that they thought Plaintiff's work was subpar and her writing and analytical skills were lacking.

138. Plaintiff knew that she had had many successes in her career, in both her litigation and appellate work, and the implicit message sent when her case load was controlled and curtailed by Defendants Dismukes and Elder, was that that Plaintiff was inferior to other attorneys who were not Black, female, and Plaintiff's age.

139. Plaintiff knew that many NC DOJ attorneys sought her advice and valued her contributions but the disparagement and denigration from Defendants Dismukes and Elder, and other members of upper-level DOJ management, including Defendant Cassell, upset Plaintiff and again made working at DOJ very hard due to the hostility from management.

140. Plaintiff knew that that the reasons given for the failure to promote

her were opposite of the facts, such as that Plaintiff was a poor writer, when judges used Plaintiff's language in their orders and opinions. Defendant Elder claimed to have had to correct language written by another attorney but borrowed by Plaintiff and stated "judges don't count." Defendant Cassell, while not known to be directly involved in the decision not to promote Plaintiff, made statements on behalf of Defendants Dismukes and Elder to a third party that left no doubt about Defendant Cassell's feelings for Plaintiff and most likely due to her race and color.

141.    All allegations of each paragraph of this Complaint are incorporated into each Count below, as though fully set out therein.

**COUNT ONE: RACE, COLOR AND SEX DISCRIMINATION
IN VIOLATION OF SECTIONS 1981, 1983, AND 1985(3)
AGAINST THE INDIVIDUAL DEFENDANTS
IN THEIR INDIVIDUAL CAPACITY**

142. Plaintiff is a dark-skinned, Black woman.

143.    Defendants are employees and officials of the State of North Carolina and acted under color of State law at all times relevant to this Complaint.

144.    Plaintiff was qualified for the position for which she applied when Defendants rejected her in favor of a male, non-Black applicant who lacked Plaintiff's qualifications.

145.    Defendants' reason for rejecting Plaintiff was pretextual because Plaintiff was exceedingly more qualified than the selected applicant to supervise the work of the other attorneys in her section.

146. Plaintiff's non-selection was because of her race and gender in violation of equal protection guaranteed by the United States and North Carolina constitutions, violated section 1983, and her non-selection based on her race also violated section 1981. Defendants also conspired to deprive Plaintiff of her civil rights under section 1985(3).

147. Plaintiff suffered damages because of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

148. As members of management of the NC DOJ acting together, Defendants conspired to deprive Plaintiff of her civil rights in violation of § 1985(3).

149. Defendants intentionally violated Plaintiff's rights under sections 1981 and 1983 with malice or reckless indifference, and, as a result, are liable for punitive damages under 42 U.S.C. § 1981a.

## COUNT TWO
## RACE, COLOR, AND SEX DISCRIMINATION
## IN VIOLATION OF TITLE VII
## AGAINST DEFENDANT NCDOJ AND
## THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY

150. Plaintiff is a dark-skinned, Black woman who worked for the Defendants in this matter either directly or indirectly.

151. Plaintiff was qualified for the position for which she applied when Defendants rejected her in favor of a male, non-Black applicant who lacked Plaintiff's qualifications.

152. Defendants' reason for rejecting Plaintiff was pretextual because Plaintiff was exceedingly more qualified that the selected applicant to supervise the work of

the other attorneys in her section.

153. Plaintiff's non-selection was because of her race, color and gender in violation of Title VII.

154. Plaintiff suffered damages because of Defendants' unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

155. Defendants intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, are liable for punitive damages under 42 U.S.C. § 1981a.

**COUNT THREE:**
**RETALIATION IN VIOLATION OF SECTION 1981**
**AGAINST THE INDIVIDUAL DEFENDANTS**
**IN THEIR INDIVIDUAL CAPACITY**

156. Plaintiff complained about the violation of her rights to equal protection under the law when she filed an internal grievance and an EEOC charge.

157. As a result of her opposition to the discrimination by Defendants, Plaintiff's cases were scrutinized, second-guessed, and micro-managed and much of the decision-making authority that similarly situated attorneys had with regard to the appeal of their cases was taken from Plaintiff. These actions constituted adverse actions and created a hostile work environment for Plaintiff. They devalued Plaintiff's high level of experience and previous contributions. an

158. As members of management of the NC DOJ acting together, Defendants conspired to deprive Plaintiff of her civil rights in violation of § 1985(3).

159. Plaintiff suffered damages because of Defendants' unlawful retaliatory

actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

160. Defendants intentionally violated Plaintiff's rights to equal protection with malice or reckless indifference, and, as a result, are liable for punitive damages under 42 U.S.C. § 1981a.

**COUNT FOUR: RETALIATION IN VIOLATION OF TITLE VII
AGAINST THE DEFENDANT DOJ
AND THE INIDIVUAL DEFENDANTS
IN THEIR OFFICIAL CAPACITY)**

161. Plaintiff complained about and opposed illegal sex, race, and color discrimination when she filed an internal grievance and an EEOC charge.

162. As a result of her participation in and opposition to the discrimination by Defendants, Plaintiff was denied an accurate performance evaluation, her cases were scrutinized, second-guessed, and micro-managed and much of the decision-making authority afforded other similarly situated attorneys with regard to the appeal of their cases was taken from Plaintiff. They devalued Plaintiff's high level of experience and previous contributions and adversely affected the terms, conditions, and benefits of her employment.

163. Plaintiff suffered damages because of Defendants' unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

164. Defendants intentionally violated Plaintiff's rights to equal protection with malice or reckless indifference, and, as a result, are liable for punitive damages under 42 U.S.C. § 1981a.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays:

1.     That this Court enjoin the Defendants from discriminating on the basis on race, color, religion, or sex in the terms and conditions of employment;

2.     That this Court enjoin the Defendants from retaliating against employees who protest illegal discrimination in the terms and conditions of employment;

3.     That this Court order Defendants to make whole Plaintiff by providing her with appropriate lost earnings and other lost benefits, with prejudgment interest, in amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, reclassification and front pay;

4.     That this Court order Defendants to make whole Plaintiff by providing compensation for nonpecuniary losses, including emotional pain, suffering, inconvenience, and mental anguish in amounts to be proven at trial;

5.     That this Court order Defendants to institute and carry out policies, practices, and programs which provide equal opportunities to qualified individuals, and which eradicate the effects of past and present unlawful practices;

6.     That this Court award the Plaintiff reasonable attorney's fees and the other costs of this action;

7.     That this Court award Plaintiff such other and further relief as may be just and equitable.

## JURY TRIAL DEMANDED

Plaintiff requests a jury trial on all questions of fact raised by the Complaint.

Case 5:21-cv-00371-BO   Document 40   Filed 03/04/22   Page 40 of 42

Respectfully submitted, this the 21st day of February 2022.

/S/ VALERIE BATEMAN
NC State Bar: 13417
T:  919-810-3139
NEW SOUTH LAW FIRM
209 Lloyd St., Ste 350
Carrboro, NC  27510
valerie@newsouthlawfirm.com

/S/ JUNE ALLISON
NC State Bar: 9673
T:  704-277-0113
NEW SOUTH LAW FIRM
233 Laurel Avenue
Charlotte,  NC  28207
june@newsouthlawfirm.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **AMENDED COMPLAINT** was served by filing the document electronically via the CM/ECF system, which will send notification of such filing to all counsel of record

This the 21st day of January 2022.

/S/ VALERIE BATEMAN
NEW SOUTH LAW FIRM